## PHILIP VERNON *v.* JOHN VERNON'S HEIRS.

The legitimacy of a child born during wedlock cannot be contested under any other circumstances than those provided for by law. C. C. 209, 210, 211.

The declarations of the father are insufficient to bastardize the issue of the marriage. To rebut the presumption of legitimacy resulting from marriage the evidence must be distinct and clear.

To render a nuncupativ e will valid, it must either have been read by the testator to the witness, or have been read by one of the witnesses to the others, in the presence of the testator. C. C. 1575, 1588.

APPEAL from the District Court of Washington, *Penn*, J. *A. Hennen*, for the plaintiff, contended: 1. The plaintiff is the legitimate son and heir of the deceased; born and reared in lawful wedlock. Is pater est quem nuptiæ demonstrant. C. C. 203. 2. The declarations of his parents cannot render him illegitimate. *Tate* v. *Penn*, 7 N. S. 548. *Eloi* v. *Mader*, 1 R. R. 584. 2 Toullier, 119 3 Partidas, tit. 14, 1. 19. Pand. lib. 22, tit. 9, 1. 29. Lacombe, "Mat. Enfant," No. 10. 2 Manf., 442. Cowper, 591. To the introduction of such evidence, bills of exception were duly taken, and should prevail. 3. No evidence to establish the illegitimacy.

The reconciliation and co-habitation of the parents, after the alleged adultery, prevent all action on it now, or prejudice to the plaintiff. Fuero Real, lib. 4, t. 7, l. 5. Partidas 7, tit. 17, ll. 8, 9. Pand. lib. 48, tit. 5, l. 13, § 6, 9, and 10, and l. 40. Tenari Bibliotheca, *verbo*, "Adulterem." Gomer Tauri, l. 80, No. 71.

The nuncupative will of the deceased is void, because not read by one of the witnesses, but by a third person, i. e. *Judge Jones;* and for other reasons, stated in the petition. C. C. 1574, 1575, 1576, 1642.

The plaintiff is entitled to an undivided half of the estate of *John Vernon*, deceased, and to be paid for one half the services of the slave *Bob*, who has not been sold, and has been in the service of the defendants—his services being worth fifteen dollars per month—with costs.

*Jesse R. Jones*, for defendants contended: The plaintiff claims to be the legitimate son of *John Vernon*, deceased, and attempts to gain a standing as such by proof of the estimation in which he was held by the deceased, his family, and the world at large; but the testimony shows that he was declared by deceased not to be his son; that the plaintiff acknowledged himself that he was not the reputed son of *John Vernon*, deceased; and that he was always considered illegitimate by the family and the world.

It further appears by the evidence of *John Dicks*, the father-in-law of plaintiff, and the cousin of *Mary Vernon*, that *John Vernon* and *Mary Vernon* were married in the year 1790, in Orangeburgh, South Carolina; that she left him, without having any children, in the year 1793, and went to Kentucky and remained until the year 1800; that she then returned to South Carolina, and brought back two boys, *Daniel* and *Philip;* that *Daniel* appeared to be about six years old, and *Philip* appeared to be about four years old. The facts detailed by this witness establish positively that at the time of the conception of *Philip Vernon*, the remoteness of the parties was such as to render their cohabitation physically *impossible;* consequently the plaintiff was an adulterous bastard, and incapable of inheriting.

It is now the settled doctrine, both in England and the United States, that, although the birth of a child during wedlock raises a presumption that such child is legitimate, yet, that this presumption may be rebutted, both by direct and presumptive evidence. And in arriving at a conclusion upon this subject, the jury may not only take into their consideration proofs tending to show the physical impossibility of the child born in wedlock being legitimate, but they may decide the question of paternity by attending to the relative situation of the parties, their habits of life, the evidence of conduct, and of declarations connected with conduct, and to every induction which reason suggests for determining upon the probabilities of the case. See 4 Phillips on Evidence, 288. 2 Greenleaf on Evidence, secs. 150, 151. 1 Phillips on Evidence, note 379.

The fact of non access may always lawfully be proved by means of such legal evidence as is strictly admissible in every other case where a physical fact is to be proved. 1 Phillips on evidence, 158, note 305. According to our code, the presumption of paternity as an incident to the marriage is at an end when the remoteness of the husband from the wife has been such that cohabitation has been physically impossible. C. C. 208, 216.

The only decisions on this subject which I have been able to find in our own reports are, *Tate* v. *Penn*, 7 N. S. 548, and *Eloi* v. *Mader*, 1 R. R. 581. In these cases it is merely decided that the declarations of the parents cannot destroy the legitimacy of the child; and in the first mentioned case, that the fact of the husband residing in New Orleans and the wife on the opposite side of Lake Pontchartrain, distant about twenty-five miles, was not sufficient evidence of a physical impossibility of cohabitation. I do not consider that there is any thing in these decisions to show any variance between our jurisprudence and that of the other States of the Union, and of England on this subject. The same rules also prevail in France. 2 Toullier, Nos. 799, 820.

The articles in the Civil Code which require the husband, when he intends to contest the legitimacy of the child, to do it in a certain time after the birth, can have no bearing on this case, for all these events occurred while *John Vernon* resided in South Carolina, and he never became subject to the Civil Code of Louisiana until the close of the year 1811, at which time the plaintiff was, according to the evidence, seventeen or eighteen years of age, and had never pretended to be the legitimate son of *John Vernon;* was not so considered in the estimation of the family and community; and indeed never made any such claims until the petition in the present suit was filed.

The judgment of the court was pronounced by

EUSTIS, C. J. This suit was instituted to set aside the last will of *John Vernon*, deceased; the plaintiff alleging himself to be the son and forced heir of the testator concurrently with the heirs of his deceased brother, *Daniel Vernon*. By the will the plaintiff was excluded from all share in the succession, the testator declaring therein that *John Vernon* was his only legitimate child, and that the children of *John* were his sole legal heirs: these children were instituted his heirs, under the will, to the exclusion of all others.

The district judge was of opinion that the condition of the plaintiff, as heir of the testator, was disproved by its being established that he was the issue of an adulterous connection between *Mary Vernon*, the wife of *John Vernon*, the testator, and another person—having been born at a time when the distance of the husband and wife from each other rendered their cohabitation impossible. The plaintiff was non suited in the court below, and has taken this appeal.

If the plaintiff is not the legitimate son of the testator he has no interest in contesting the will. This question is therefore the first object of inquiry. The facts relating to the legitimacy of the plaintiff are disclosed in the testimony of *John Dicks*, a witness examined on behalf of the defendants. He is the father-in-law of the plaintiff, and was the cousin of *Mary Vernon*, the mother of the plaintiff. By this testimony it appears that *John Vernon* and *Mary Vernon* were married about the year 1790, in Orangeburgh district in South Carolina, where they resided. In March, 1793, she abandoned her husband, and report said she went to Kentucky. She did not return until the fall of 1800. A report had reached the neighborhood that she desired to return, which originated in a letter written by her to that effect. By this letter it would appear that she was living under a feigned name, and that the man with whom she had abandoned her home had left her. She had no children during the period of her living with her husband, but after her return to Carolina in 1800 she again was absent with her brother, and brought back two children born during her absence: these children were *Daniel Vernon*, whose heirs are the defendants, and *Philip*, who is the plaintiff in this suit. The former was in appearance about six, and the latter about four years of age. After the return of the mother, the husband made repeated overtures for a reconciliation. She objected on the ground that she had misbehaved, and that it would always be thrown up to her, and that she could not live with him without her child. The parties met at the house of the sister of *Vernon*. He proposed their coming together.

She said she could not live with him unless her child was received. *Vernon* said they had one between them, but that long before she had left him he had had an illegitimate child, named *Jack*, who was then in the neighborhood; that he was willing to take all the boys, *Daniel*, *Philip* and *Jack*, and bring them up as brothers and treat them as children, and that at his or his wife's death they should share alike. His wife agreed to this; they embraced, and the reconciliation was consummated, and they lived conjugally together until the death of *Mrs. Vernon*. The parents and children remained together in South Carolina until 1806. In 1810, the witness found them all living together on the Tanchipao, in this State; they continued living together until the marriage of *Daniel* and *Philip*. At the death of *Mrs. Vernon*, *John Vernon*, the father, divided equally the property belonging to her between her sons *Daniel* and *Philip*. When *Mrs. Vernon* and her brother went after her children, they said they were going to Cumberland river; they were absent about five weeks. The witness and *John Vernon* lived close together in the same neighborhood in Carolina. *Vernon* did not leave at any time that section of country. Witness knows this fact from being intimate with him, and that he never left South Carolina until he removed from there in 1806.

The testimony of this witness, who appears to be a conscientious and truthful man, is weakened or rather explained in his cross-examination, in which he says he has no personal knowledge of *Mrs. Vernon* having been in Kentucky. From all the witness knows, she might have been during her absence within fifty miles of *John Vernon's* residence. He saw the latter two or three times every month during *Mrs. Vernon's* absence; thinks he was never longer than three weeks at any one time without seeing him; it may have been a month. The witness is satisfied, from his intimacy with *Vernon*, that had they ever met during her absence from 1793 to 1800 he, the witness, would have known it. We have thus stated the material parts of the testimony of this witness for the purpose of showing its extent and its legal effect.

It is certainly proved that in 1793 *Mrs. Vernon* left the residence and neighborhood of her husband; but as to where she went there is no satisfactory evidence. Supposing she went to the region which the report stated,—to Kentucky,—to that part of it in which the Cumberland river has its source, and that *John Vernon* never left his neighborhood in South Carolina, it is obvious that these facts do not establish the impossibility of access and cohabitation of these parties. The evidence on this point is not at all satisfactory. There is no proof, other than that stated, as to where *Mrs. Vernon* went, or was at any time from 1793 to 1800.

It appears in evidence that *Philip* was brought up and married in the house of *John Vernon*, and was until his marriage on the same footing as *Daniel*. But *John Vernon*, in the significant language of the neighborhood, did not claim *Philip* as his son. This *Philip* himself said to a witness; and it concurs with the declaration of the testator in his will.

The marriage of *John Vernon* with *Mary*, the mother of the plaintiff, in 1790, having been proved to have taken place in South Carolina, the argument has principally been directed to the *status* of the plaintiff under the jurisprudence of that State. Under our laws, as the case stands, the defendants would not be permitted to question the legitimacy of the plaintiff. Code, 209, 210, 211.

We assume that the rule established by the judges in the Banbury peerage case would control the condition of the plaintiff at the time of his birth. He was born during marriage; and the marriage having been proved, nothing is allowed

to impugn his legitimacy, short of the proof of facts showing it to be impossible that the husband of his mother could be his father. The declarations of the father are entirely insufficient to bastardize the issue of the marriage, both by our law and that of England. *Goodright v. Moses*, Cowper's Rep. 591. 2 Greenleaf on Evidence, § 153.

We understand, that to rebut the presumption of legitimacy resulting from marriage, the evidence against it ought to be distinct, clear and conclusive. It is sufficient to state that the evidence adduced in this case is not of that character. It is at best, conjectural; and at this distance of time it would be equally unjust and dangerous to deprive a man of his *status* of legitimacy by any evidence short of that which the law and public policy require to be administered in order to destroy the effect of a civil institution upon which society rests for its security.

The plaintiff being therefore a competent party to contest the will of *John Vernon*, it remains to consider the objections to its validity. The most important is that the formalities of the article 1575 of the Code have not been complied with in making it. The will was intended to be a nuncupative will under private signature. The article 1575 requires this kind of testament to be read by the testator to the witnesses, or by one of the witnesses to the rest in the presence of the testator. The article 1588 provides that the formalities to which testaments are subject by the provisions of this section must be observed ; otherwise the testaments are null and void.

The will declares it to have been dictated by the testator and written by his request, and to have been read to him in the presence of the witnesses, but does not state that it was read by the testator to the witnesses, or by one of the witnesses to the rest in the presence of the testator. And it is not proved by the testimony taken in the cause that it was so read by the testator or one of the witnesses. Indeed, the testator was incapable of reading the will, and it was read by the professional gentleman who wrote it to the testator and the witnesses. This is the only reading of the will which is established by the testimony. We think this an essential requisite to the validity of the will. *Succession of Key*, 5 R. R. 483. It not having been complied with, the will is null and void.

It is therefore decreed, that the judgment of the district court be reversed ; and it is further decreed, that the instrument of date the 17th day of January, 1847, purporting to be the last will and testament of *John Vernon* be declared null, void, and of no effect; and it is further decreed that the plaintiff, *Philip Vernon*, be admitted as one of the heirs of the deceased *John Vernon*, to share equally with the defendants, representing the deceased *Daniel Vernon*, and receive as heir one half of the effects of the succession of the deceased, and that the case be remanded for a partition of the same, and a settlement of the accounts thereof; the defendants paying costs in both courts.

PRESTON, J., dissenting. The plaintiff declares he is the legitimate son of *John Vernon*, deceased ; and sues his grand-children, one of whom is his executor, to annul his will and for half his succession. They deny that he is the son of *John Vernon*.

The plaintiff very properly rests his case on sufficient proof of the fact that he was born of the wife of *John Vernon* during the existence of their marriage.

But one of his witnesses, *Simeon C. Bankston*, proves that he heard " the old man say that he did not own *Philip* as his child ; that *Philip* himself said that the old man did not claim him, and that it was the general understanding in

the neighborhood that *Philip* was not claimed by the old man *Vernon* as his child."

*John Dicks* is the father-in-law of the plaintiff, and was also the cousin of his mother. There is not a shade of suspicion cast upon his testimony by the plaintiff. He had every possible motive to support his pretensions. His testimony must therefore be regarded as a severe sacrifice to truth and justice.

He proves that *Mrs. Vernon* left her husband in South Carolina in March, 1793, and did not return until 1800 ; during which time her husband was not absent from his residence; that she left without children and returned with two, of whom plaintiff was the youngest. He then enters into details which show fully that *Mrs. Vernon* went to Kentucky and lived under an assumed name with a paramour, who abandoned her; when she returned to Carolina, and in the subsequent negotiation, by which her husband was reconciled to her, fully acknowledged that *Philip* was not his child.

This testimony establishes beyond all reasonable doubt that the husband had not access to his wife for seven years, during which time she had two children. The youngest could not therefore be the child of the husband.

The answer to hypothetical cross-interrogatories, so often put in cases of this kind,—for example, might not the husband and wife have come together without your knowledge ?—must always be the same which counsel, judges, or jurymen would give without the answer of the witness, and never has any effect upon the case, the court, or the jury.

*John Vernon*, at a great age, and on the brink of the grave, in the midst of infirmity, being blind, and having no motive to deceive, but every possible inducement to declare the truth, and not leave the world with the stain of falsehood on his soul, with regard to the only thing any longer of importance to him or those connected with him, made what was intended to be his last will, which was reduced to writing under his direction and signed before three neighbors and his legal adviser. Although informal as a will, it is a formal declaration of the truth. After appealing, as usual, to the name of God, he said, "I now solemnly declare that *Daniel Vernon*, now deceased, was my only legitimate child, and that his children are my only legal heirs."

The plaintiff, pretending to be the son of the deceased for the purpose of claiming a portion of his property, is compelled to stamp this solemn and, we may say, dying declaration of his supposed father with falsity. But it is impossible to yield to his pretensions to *Vernon's* property, based upon the stigma of him he calls father, unless compelled by irresistible proof or the inexorable rules of law.

There is not the slightest proof to counteract all this irresistible evidence of the plaintiff's illegitimacy. Is it counteracted by law ? The principles of our Code which require the husband to denounce the infidelity of his wife, and judicially to bartardize her offspring are not applicable to the circumstances of this case, which occurred in South Carolina fifty years ago. They are rigorous principles of law requiring the husband and father to spread the shame of his wife and children on record, and thus to render reconciliation and forgiveness impossible, or to subject himself to the paternity of her spurious offspring. It is more conformable to the spirit of christian forgiveness, if possible to be reconciled to a wife and mother of one's children, even after the foul blot of her infidelity, as was done in the present case. These rules of our Civil Code should not be extended to a case which did not arise under them.

VERNON
*v.*
VERNON'S
HEIRS.

So the arbitrary rules of evidence which exclude the truth should not be extended beyond the positive enactments of law. There is no enactment of our own Legislature which excludes the acknowledgment of the plaintiff's mother that he was not her husband's child, and the most solemn written declarations of the husband to the same effect, as evidence in this case, in opposition to his claim as heir of the husband. On the contrary, the articles 214 and 215 of our Code authorizes every species of evidence, written or oral, in support of legitimate filiation; and the next article, 216, authorizes proof against legitimation, that "the plaintiff is not the child of the husband of his mother." The article limits it to no particular species of evidence, and seems by its connection with the preceding articles, all are on one subject, to authorize all proof in opposition to legitimacy which could be offered in its support. The declarations of parents are the strongest evidence in support of legitimacy, and therefore should be admitted in opposition to it.

I am led to the conclusion from reading the opinion of Lord Mansfield, in the case of *Goodright* v. *Moses*, 2 Cowper's Rep. 594, so much relied upon by the counsel of plaintiff, that such declarations are admissible as evidence to the jury n England. The rule that no evidence, except the impossibility of the husband's access, should be admitted to establish the illegitimacy of a child born of the wife during the marriage has long since been abandoned in that country.

In the case of *Goodright* v. *Saul* a new trial was granted to prove a child illegitimate, his mother and her husband both living in London at his birth, because she lived with a paramour, called the child by his name, and it was reputed in the family to be illegitimate. 4 Durnf. and East. 358. The cases are numerous to that effect.

It is certainly laid down in general terms by Toullier, that the declarations of husband and wife shall not establish the illegitimacy of the wife's child, born during the marriage: and our Supreme Court adopted the principle in the case of *Tate* v. *Penn*, to prevent the mother from reaping advantage from her shameless declaration.

But a note to the very section of Toullier furnishes a decision of the courts in France to the contrary, in the case of the illegitimate daughters of *Antoine Lamarié*. They were baptized by the mother as the children of *Beancé*, with whom she lived in adultery during *Lamarié's* life. And after his death they failed in a suit to change the act of baptism and recover the succession of *Lamarié*.

The whole evidence was received by the district judge. He resided in the parish, knew the parties and witnesses, and on the question of fact decided against the plaintiff's pretensions; and I think his judgment should prevail.